IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Case No. 11-cv-002946-LTB

THOMAS W. PRESTON,

        Plaintiff,
v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

        Defendant.

___

ORDER
___

      Plaintiff, Thomas W. Preston, appeals from the Social Security Administration ("SSA") Commissioner's final decision denying his application for disability insurance benefits, filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401-433, and his application for supplemental security income, filed pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383c. Jurisdiction is proper under 42 U.S.C. § 405(g). Oral argument would not materially assist me in the determination of this appeal. After consideration of the parties' briefs, as well as the administrative record, I REVERSE the Commissioner's final order and I REMAND for additional proceedings.

## I. STATEMENT OF THE CASE

      Plaintiff seeks judicial review of the Commissioner's decision denying his applications for disability insurance benefits and for supplemental security income filed in October of 2008. [Administrative Record ("AR") 108, 115] After the applications were initially denied on February 5, 2009, an Administrative Law Judge ("ALJ") conducted an evidentiary hearing on

January 28, 2010, and issued a written ruling on May 17, 2010. [AR 11-22, 23-64] The ALJ denied Plaintiff's applications on the basis that he was not disabled because Plaintiff had the residual functional capacity ("RFC") to perform other work existing in significant numbers in the national economy (Step Five). [AR 22] The SSA Appeals Council subsequently denied Plaintiff's administrative request for review of the ALJ's determination, making the SSA Commissioner's denial final for the purpose of judicial review. [AR 1] *See* 20 C.F.R. § 416.1481. Plaintiff timely filed his complaint with this court seeking review of the Commissioner's decision.

## II. FACTS

Plaintiff was born on June 17, 1964, was 42 at the time of the ALJ's hearing, and had obtained a high school education. [AR 21, 211] His past relevant work history was as a health, safety and environmental compliance administrator, among other highly skilled occupations, in oilfields located in Texas. [AR 21] In his applications, Plaintiff alleged he became disabled on May 3, 2007, due to various physical and mental conditions, including back injury, spinal fusions, bi-polar, depression and mental issues. [AR 160, 164]

The medical records in this case commence in 1990, when Plaintiff was diagnosed with degenerative disc disease of the thoracic spine at T8-T11. [AR 354] Plaintiff sought treatment for complaints of pain in his neck and back at the North Texas Medical-Surgical Clinic in February and October of 2006. [AR 373-74] Also during this time he sought treatment for unrelated physical complaints, such as elevated blood pressure and headaches. [AR 17, 354-82]

There are no medical records that coincide with Plaintiff's alleged onset date in May 2007. [AR 17] Approximately 8 months after that date, on December 31, 2007, Plaintiff was

admitted to the East Texas Medical Center following a suicide attempt by overdose. [AR 256] Plaintiff was referred to the Behavioral Health Center, where he was admitted and treated by David Colvin, D.O. [AR 237-38]  Dr. Colvin noted that Plaintiff had feelings of depression and suicidal thoughts, and described stress related to his finances, family, and being laid off from work. [AR 237]  After four days of inpatient treatment, Dr. Colvin discharged Plaintiff on January 4, 2008, with an assessed Global Assessment of Functioning (GAF) score of 50. Plaintiff was diagnosed with major depression – single episode moderate without psychosis – hypertension, and chronic back pain. [AR 237-238, 316]

There is a gap in the medical records until July 9, 2008, when Plaintiff sought treatment for chest pain and shortness of breath. [AR 17, 247-53]  A chest x-ray revealed an "[a]rea of increased density, right lower lobe laterally, may represent volume loss of developing pneumonia." [AR 259]  This chest pain was ultimately described as "nonspecific," and Plaintiff was discharged. [AR 249]

Plaintiff then moved to Colorado, and established care at a health clinic for the homeless – Peak Vista Community Health Center – with M.D. Welch, D.O., in August 2008. [AR 263-315]  His main complaints at his initial visit were hypertension and back pain, he reported difficulty in sleeping and increased isolation due to anxiety, and indicated that he had been out of medications for several weeks. [AR 305]  His history of depression was noted, but Plaintiff was described as articulate and had a normal mental status examination. [AR 308]  Three days later, Plaintiff returned to the clinic complaining of anxiety and feeling uncomfortable around other people. [AR 302]

Over the course of several visits to the clinic in September 2008, Plaintiff reported "feeling anxious most of the time especially around lots of people," [AR 299] and he brought a note from a counselor at the shelter wondering if he was bipolar. [AR 295-97] Plaintiff scored eleven positive responses on a Mood Disorder Questionnaire and, as a result, was diagnosed with bipolar disorder by Dr. Welch and put on Seroquel on September 5, 2008. [AR 297] Plaintiff continued to report sleep disturbances and elevated anxiousness. [AR 291-94] On September 19, 2008, Dr. Welch noted that Plaintiff's bipolar disorder was being "sub-optimally treated." [AR 292] In October 2008, Plaintiff reported to the clinic three times with anxiety/panic attack/depression and back pain. [AR 277, 280] He reported disturbing dreams, a panic attack and profound social anxiety. [AR 285] On October 10, 2008, Dr. Welch noted that he "continued [to] suspect patient is bipolar" and thus wanted to have him evaluated by psychiatrist. [AR 282]

As a result, Plaintiff saw Martin Kron, M.D., a psychiatrist, on October 13, 2008. [AR 270-276] Plaintiff complained of difficulty concentrating, not wanting to be around people, and feeling stress related to his past work in the oilfields. [AR 270-72] Dr. Kron reviewed and discussed Plaintiff's treatment history and the effects of different psychiatric medications. [AR 271] Plaintiff spoke at a low volume, showed a restricted affect, and had limited insight, but was also alert, cooperative, goal-directed, logical, not suicidal, not hallucinating, had an "okay" mood, and demonstrated "fair to good" judgment. Dr. Kron assessed Plaintiff's GAF at 61-70, gave rule out diagnoses of major depression and generalized anxiety disorder, but did not assess any other mental conditions. [AR 271, 276] Plaintiff went to the clinic one more time, in November of 2008, complaining of back pain and that his bipolar symptoms were preventing

4

him from carrying out his daily activities. [AR 263-66]

In January 2009, the State Disability Determination Services referred Plaintiff to Victor Neufeld, Ph.D., for a psychological examination. [AR 316] At that examination, Plaintiff reported living in a tent camp outside of town, and indicated that he had procured food stamps. [AR 317] Plaintiff told Dr. Neufeld that he was "indifferent" to working and that he was "happier than I've ever been." He stated that he "did not know why" he left his past job as a health and safety specialist, and he reported that he had been diagnosed as bipolar. Dr. Neufeld noted that Plaintiff was fully oriented, showed good attention and working memory, but showed a possible, mild memory impairment. [AR 318] Dr. Neufeld's notes indicate that Plaintiff answered positive to 9 items on a Mood Disorder Questionnaire – which is used as a screening instrument for detection of bipolar disorder – and "[a] score of 6 items endorsed in the positive direction suggests high probability of bipolar disorder." Plaintiff's endorsement of 9 exceeded this criteria and he also met criteria suggesting features of schizoid personality disorder. [AR 318]  Dr. Neufeld diagnosed Plaintiff with:  bipolar disorder; anxiety disorder not otherwise specified with features of post traumatic stress disorder and panic; a "rule out" diagnosis for a cognitive disorder not otherwise specified; and features of schizoid personality disorder.  Dr, Neufeld assessed a GAF of 50. [AR 318-19]  Dr. Neufeld further opined that Plaintiff's occasional difficulty sleeping suggested "possible" mania, though it "does not sound extreme," and opined that Plaintiff's social interaction with orders "or his ability to work at many jobs" would be "markedly impaired" by his schizoid personality features.  [AR 319]

In February 2009, a non-physician Single Decision Maker reviewed Plaintiff's medical records and completed a Physical Residual Functional Capacity Assessment form concerning

Plaintiff's physical limitations on his ability to work due to his "low back pain." [AR 320-27] The Single Decision Maker opined that Plaintiff could perform a range of medium work, although he should avoid "extreme cold." [AR 324]

At the same time, a psychologist, James Wanstrath, Ph.D., completed a psychiatric review of Plaintiff's medical records. [AR 330-343] Dr. Wanstrath opined that Plaintiff experienced various mentally determinable impairments including: a rule-out diagnosis for an organic mental/cognitive disorder, not otherwise specified; bipolar disorder; anxiety disorder, not otherwise specified, with features of PTSD and panic; and features of schizoid personality disorder. [AR 330-337] Dr. Wanstrath rated the severity of Plaintiff's mental conditions as causing "mild' limitations of activities of daily living and difficulties of maintaining concentration, persistence or pace, and "moderate" limitations in difficulties on maintaining social functioning. [AR 340] Dr. Wanstrath also performed a Mental Residual Functional Capacity Assessment form – related to Plaintiff's ability to work – in which he opined that Plaintiff had some moderate limitation in his ability to understand, remember, and carry out detailed instructions; to work with others without being distracted by them; in his ability to get along with coworker or peers; and to interact with the general public. [AR 344-45] He concluded that:

> This 44 yr old male experience[s] some anxiety and depression but remains cognitively intact. Concentration is not affected by his mood or anxiety disorder. [H]e could generally understand, remember and carry through on simple tasks as well as more complex tasks or detailed instructions, with minimal contact with others. [H]e can maintain attendance/pace within those limitations. [AR 346]

After a lengthy period of seeking no medical treatment, Plaintiff reported to the clinic in June of 2009 complaining of exacerbation of his usual back pain, and reported that he was no

6

longer seeking out social interaction, and was worried about slipping into depression. [AR 398-99]  In July 2009 he returned to the clinic for management of his medications because his back pain was getting worse, and he was experiencing increased panic attacks. [AR 391, 394]  During an August 2009 visit, Plaintiff reported back pain and that he was again having sleeping difficulties. [AR 435]

Based on his complaints of increasing pain and spasms, Plaintiff underwent x-rays of his thoracic spine on July 27, 2009, which revealed degenerative changes but no evidence of trauma or of acute osseous abnormalities or bony trauma, and were described as "fairly stable." [AR 387, 384]  He was referred for physical therapy, and participated in nine physical rehabilitation appointments in August and September of 2009. [AR 402-417]  It was determined that he would benefit from a TENS Unit for pain relief. [AR 407]   He visited the clinic four times in November and December of 2009, for chest pains, difficulty breathing and anxiety. [AR 418, 421, 424, 428, 438]

In his Functional Report dated November 2008, Plaintiff indicates that after the alleged onset of disability he became homeless. [AR 193]  In a typical day, he described going to a church for breakfast and a soup kitchen for lunch.  He attended medical appointments, went to the library to read, and picked up canned food from a center for the homeless, and was able to clean and do his laundry. [AR 193]  Barbara Jo Peterson – Plaintiff's counselor and advocate at Pikes Peak Community Action Agency – submitted a written statement in support of Plaintiff's application that was consistent with Plaintiff's statement. [AR 201-207]

At the hearing in January 2010, Plaintiff testified that he was homeless and living in a tent. [AR 31]  On bad days he would not leave his tent much, but he also described going into

town and playing music for seniors at a local church, with a friend. [AR 32]  He testified that due to his mental impairments, he did not like traveling, preferred not being around "a bunch of people," and that he had impaired concentration. [AR 38-41, 44]  Plaintiff described his December 2006 suicide attempt and indicated that he had not felt suicidal since moving to Colorado. [AR 42-43]  Ms. Peterson also testified on Plaintiff's behalf. [AR 60]  In addition, Dennis Duffin, a vocational expert, testified that a hypothetical person, limited to a modified range of medium work, was capable of other work – as a hand packager, floor waxer, or industrial cleaner/sweeper – available in the national economy. [AR 62-63]

### III. LAW

A five-step sequential evaluation process is used to determine whether a claimant is disabled under Title II and Title XVI of the Social Security Act, which is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 137, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987).

Step One is whether the claimant is presently engaged in substantial gainful activity.  If he is, disability benefits are denied.  *See* 20 C.F.R. §§ 404.1520, 416.920.  Step Two is a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. §§ 404.1520(c), 416.920(c).  If the claimant is unable to show that his impairment(s) would have more than a minimal effect on his ability to do basic work activities, he is not eligible for disability benefits.  Step Three determines whether the

impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).  If the impairment is not listed, he is not presumed to be conclusively disabled.  Step Four then requires the claimant to show that his impairment(s) and assessed residual functional capacity ("RFC") prevent him from performing work that he has performed in the past.  If the claimant is able to perform his previous work, the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520 (e)&(f), 416.920(e)&(f).  Finally, if the claimant establishes a *prima facie* case of disability based on the four steps as discussed, the analysis proceeds to Step Five where the SSA Commissioner has the burden to demonstrate that the claimant has the RFC to perform other work in the national economy in view of his age, education and work experience. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).

## IV. ALJ's RULING

The ALJ ruled that Plaintiff had met the insured status requirement of the SAA through December 31, 2012, and that he had not engaged in substantial gainful activity since May 3, 2007, the alleged onset date (Step One). [AR 13]  The ALJ further determined that Plaintiff had the severe impairments of anxiety-related disorders, affective disorders, and disorder of the spine (Step Two), but that these impairments did not meet or medically equal a listed impairment deemed to be so severe as to preclude substantial gainful employment (Step Three). [AR 14] The ALJ then determined that Plaintiff was able to perform medium work, except that he was limited by the "need to have less than occasional dealings with the general public and minimal supervision." [AR 16]  However, because he was now limited to unskilled work, the ALJ found that Plaintiff was unable to perform any of his past relevant work which was "highly skilled"

(Step Four). [AR 21]  The ALJ then went on to assess whether the SSA Commissioner met his burden to demonstrate that Plaintiff was able successfully adjust to other work.  After finding that Plaintiff was a younger individual, had at least a high school education and is able to communicate in English, the ALJ used the Medical-Vocation Guidelines (the "Grids") as a framework to determine that considering his age, education, work experience and RFC, jobs exist in significant numbers in the national economy that Plaintiff can perform (Step Five).  As a result, the ALJ concluded that Plaintiff was not disabled at Step Five of the sequential process and, therefore, was not under disability as defined by the SSA. [AR 21-22]

## V. STANDARD OF REVIEW

This court's review is limited to whether the final decision is supported by substantial evidence in the record as a whole and whether the correct legal standards were applied. *Williamson v. Barnhart,* 350 F.3d 1097, 1098 (10th Cir. 2003); *White v. Barnhart,* 287 F.3d 903, 905 (10th Cir. 2001); *Qualls v. Apfel,* 206 F.3d 1368, 1371 (10th Cir. 2000).   Thus, the function of my review is "to determine whether the findings of fact . . . are based upon substantial evidence and inferences reasonably drawn therefrom; if they are so supported, they are conclusive upon [this] reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970). "Substantial evidence is more than a scintilla, but less than a preponderance; it is such evidence that a reasonable mind might accept to support the conclusion." *Campbell v. Bowen*, *supra*, 822 F.2d at 1521 (*citing Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d. 842 (1971)).  I may not re-weigh the evidence or substitute my judgment for that of the ALJ.  *See Casias v. Secretary of Health & Human Servs.,* 933 F.2d 799, 800 (10th Cir. 1991); *Jozefowicz v. Heckler*, 811 F.2d 1352, 1357 (10th Cir.

1987); *Cagle v. Califano*, 638 F.2d 219, 220 (10th Cir. 1981).  With regard to the application of the law, reversal may be appropriate when the SSA Commissioner either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards.  *See Winfrey v. Chater,* 92 F.3d 1017, 1019 (10th Cir. 1996).

## VI.  ISSUES ON APPEAL

On appeal, Plaintiff first argues that the ALJ erred in weighing the medical opinions of record with regard to the effect that his mental conditions have on his ability to work.  The ALJ concluded, after evaluating those opinions, that Plaintiff was limited by his mental impairments by the "need to have less than occasional dealings with the general public and minimal supervision." [AR 16]  Because I conclude that the ALJ's assessment/legal analysis of the medical opinion evidence is insufficient, I agree with Plaintiff that the ALJ erred in assessing his RFC – related to his limitations based on his mental impairments – and, as such, reversal is warranted.

The law for evaluating opinions of a physician who has treated a claimant (a treating source), a physician who has examined a claimant but never had a treatment relationship (non-treating source), and physician who has merely reviewed the medical records (a non-examining source) is as follows.  *See* 20 C.F.R. §§ 404.1527(d), 416.927(d); Social Security Ruling (SSR) 96–5p.  First, if the Commissioner "find[s] that a treating source's opinion on the issue(s) of the nature and severity of [the claimants] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [claimant's] case record, [the Commissioner] will give it controlling weight." 20 C.F.R. §§ 404.1527(d)(2),  416.927(d)(2); *see also Watkins v. Barnhart*, 350 F.3d 1297, 1300–01

(10th Cir. 2003)(*citing* Social Security Ruling 96–2p). Even if the treating source opinion is not given controlling weight, his or her opinion is still generally entitled to "particular weight," as a treating source is expected to have greater insight into the patient's medical condition. *Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003). Thus, it "must be weighed using all of the factors provided in 20 C.F.R. §416.927." *Watkins v. Barnhart*, *supra,* 350 F.3d at 1301; *see also Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001)(*citing Goatcher v. Dep't of Health & Human Servs.*, 52 F.3d 288, 290 (10th Cir. 1995)). After considering those factors, the ALJ must give the reasons in the decision for the weight he gives the treating source opinion. *Watkins v. Barnhart*, *supra*, 350 F.3d at 1301. "[I]f the ALJ rejects the opinion completely, he must then give 'specific, legitimate reasons' for doing so." *Id.* (*citing Miller v. Chater*, 99 F.3d 972, 976 (10th Cir. 1996)(*quoting Frey v. Bowen*, 816 F.2d 508, 513 (10th Cir. 1987)).

After the ALJ determines that there are no treating source opinions which are worthy of controlling weight, the ALJ then determines the relative weight to be accorded to all of the medical source opinions (including the opinions of "other" medical sources who are not "acceptable medical sources"). Social Security Ruling 06–03p. The opinion of a non-treating source – an examining physician who only saw the claimant once – "is not entitled to the sort of deferential treatment accorded to a treating physician's opinion." *Doyal v. Barnhart*, *supra*, 331 F.3d at 763 (*citing Reid v. Chater*, 71 F.3d 372, 374 (10th Cir.1995)). However, the opinions of such non-treating sources are generally given more weight than the opinions of non-examining sources who have merely reviewed the medical record. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir.2004); *Talbot v. Heckler*, 814 F.2d 1456, 1463 (10th Cir.1987). In this analysis, the ALJ must remember that deference is due a treating source opinion, and must explain why he

finds the opinion of another source outweighs the opinion of the treating source.  *Goatcher v. Dep't of Health & Human Servs*, *supra*, 52 F.3d at 290 (*citing Reyes v. Bowen*, 845 F.2d 242, 245 (10th Cir.1988)).

In his order, the ALJ weighed the opinion evidence, related to Plaintiff's mental impairments and limitations, as follows.  First, he gave "great weight" to the opinion of Dr. Kron – Plaintiff's psychiatrist – who opined that Plaintiff was able to function "pretty well" as evidenced by his GAF score of 61-70. [AR 19]   He gave less weight to the opinion of Dr. Welch – Plaintiff's treating physician – than to the opinion of Dr. Kron.  Specifically, the order indicates that although Dr. Welch gave Plaintiff a "preliminary diagnosis of bipolar disorder based on the claimant's [self] reports," he "did not determine that the claimant's psychological impairments prevented work activity." [AR 19]

Dr. Neufeld – a clinical psychologist who interviewed Plaintiff and reviewed his medical records – opined that Plaintiff "suffers from features of bipolar disorder, anxiety disorder, and features of schizoid personality disorder," but suffers "no significant cognitive problems apart from possibility of mild memory impairment."  The ALJ afforded Dr. Neufeld's "substantial weight." [AR 19]

Finally, the opinion expressed by Dr. Wanstrath – in his non-examining psychiatric review of Plaintiff's records –were accepted and adopted by the ALJ as his conclusions were "consistent with Dr. Neufeld's analysis."  Dr. Wanstrath opined that Plaintiff "primarily suffers from anxiety disorder with features of PTSD and panic disorder, as well as features of a schizoid personality disorder,"  but he does not conclude that Plaintiff suffers from a bipolar disorder.  As such, Dr. Wanstrath concluded that Plaintiff "had some moderate limitation in the ability to

understand, remember, and carry out detailed instructions; and to work with others without being distracted by them" and was also "moderately limited in the ability to get along with coworkers and peers and the interact with the general public." In addition, he concluded that Plaintiff "not be required to have more than minimal contact with others." [AR 19-20]

Plaintiff argues on appeal that the ALJ erred in his analysis of the medical opinion evidence. Among other arguments, Plaintiff asserts that the ALJ's finding that Dr. Wanstrath's opinions were "consistent with Dr. Neufeld's" is not supported by the evidence of record. Specifically, he argues that Dr. Wanstrath's opinion – that Plaintiff only had moderate limitations in the ability to get along with co-workers and to interact with the general public with no more than minimal contact with others – is not consistent with Dr. Neufeld's opinion – that Plaintiff's social interaction with orders and his ability to work at many jobs would be "markedly impaired" by his schizoid personality features.

I agree that Dr. Wanstrath and Dr. Neufeld's opinions are clearly not consistent and I reject the argument made by the Commissioner that I am to defer to the ALJ's factual findings in which he "expressly gave weight to Dr. Neufeld's opinions, but did not adopt them" by instead adopting the opinion of Dr. Wanstrath related to Plaintiff social limitations. While the ALJ could have rejected the opinions of Dr. Neufeld, his order did not indicate that he did; rather, the order states that it gave Dr. Neufeld's opinion (as an examining clinical psychologist) "substantial weight" but then, apparently, rejected his opinions related to Plaintiff's social functioning and instead relied upon the opinions of Dr. Wanstrath (as a non-examining expert) related to Plaintiff's social functioning on the basis that his opinion is "consistent with Dr. Neufeld's analysis." [AR 20].

"The ALJ's failure to apply the correct legal standards or to provide the court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005); *see also Byron v. Heckler*, 742 F.2d 1232, 1235 (10th Cir. 1984)("[f]ailure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal")(internal quotations omitted and emphasis added).  As such, I conclude that the ALJ's order fails to demonstrate reliance on the correct legal standards when evaluating the opinions of Drs. Neufeld and Wanstrath when assessing Plaintiff's ability to socially interact in the workplace based on the limitations related to his mental impairments.

ACCORDINGLY, for the foregoing reasons, I REVERSE the Commissioner's final order, and I REMAND the matter to the Commissioner for further proceedings consistent with this order and judgment.

Dated: February   20  , 2013 in Denver, Colorado.

BY THE COURT:

  s/Lewis T. Babcock
LEWIS T. BABCOCK, JUDGE